# LOIS M. STUART, PERSONAL REPRESENTATIVE OF THE ESTATE OF CHESTER JOHN BLUM, DECEASED *v.* DEPARTMENT OF REVENUE

Lee A. Hansen, Brown, Hansen & Steenson, P.C., Portland, represented plaintiff.

G. F. Bartz, Assistant Attorney General, Salem, represented defendant.

Decision for defendant rendered May 3, 1976.

CARLISLE B. ROBERTS, Judge.

Plaintiff appeals from defendant's Order No. IH 75-2, dated January 27, 1975, in which the Department of Revenue, for purposes of Oregon's inheritance tax, affirmed inclusion in the taxable estate of the decedent the value of a farm transferred by him to his daughter and her husband some six years prior to his death. The Department of Revenue seeks to tax the farm value under the provisions of ORS 118.010(1).

Mr. Chester John Blum, the decedent, died on June 2, 1972, at the age of 84, in Salem, Marion County, Oregon. During his later years, he was a widower and lived on his farm of 853.73 acres. He had three children, Gladys G. Dake, Chester John Blum, Jr., and Lois M. Stuart.

His relationship with his daughter, Lois, and her husband, Richard G. Stuart, was particularly close. When Lois married Richard Stuart, a home was constructed on Mr. Blum's property and title to the 5-acre homesite was transferred to Lois Stuart. Mr. Blum habitually ate at least one meal a day with the

Stuarts. Although Mr. Stuart had a full-time job in a local auto dealership, he often helped Mr. Blum with farm chores during evenings and weekends, without pay.

This relationship was formalized somewhat on April 19, 1963, when Mr. Blum and the Stuarts signed a partnership agreement "for the carrying on the business of farming" for a specific term of five years, "until the 1st day of January, 1968, * * *." Mr. Blum agreed to "furnish the land, equipment and livestock as now existing * * *." The Stuarts and Mr. Blum joined in depositing $2,000 in a farm partnership bank account. The agreement required the parties to devote themselves diligently to the farm and to share income and expenses equally between them.

The written agreement was casually observed. No partnership returns were ever filed for income tax purposes. The farm was not worked intensively by any party, being largely used to pasture livestock. All farm receipts were placed in the farm account but the Stuarts received no cash "for helping out."

The partnership between Mr. Blum and the Stuarts continued until June 1966. The evidence adduced at trial indicates that, prior to that time, Mr. Blum entered into discussions with his lawyer (a witness, but not of counsel in this suit) regarding the sale of his farm to the Stuarts.[1] Mr. Blum then approached the Stuarts with his proposal to sell them the farm. Although concerned about their ability to finance such an acquisition, the Stuarts accepted Mr. Blum's proposal. They had no part in drafting the contract and had not seen it until they signed it.

[1] The farm's status as partnership property, by virtue of the 1963 partnership agreement and ORS 68.130(1), was never adverted to by any party in the trial of this suit. The record title was in Mr. Blum's name alone; he could still transfer good title to it. ORS 68.220(3).

The contract for the sale of the farm was signed on June 1, 1966, in the offices of decedent's lawyer. On the same day and place, Mr. Blum signed his last will and testament, which left all his property to his three children in equal shares.

The provisions of the contract are significant. The sale price was for $70,000. Decedent's lawyer testified that this price was arrived at by multiplying by four the farm's current assessed value for property tax purposes. (It was the practice of the county assessor at that time to assess all property at 25 percent of its true cash value.) Based on the 1965-1966 tax statement, the assessor's "true cash value" was $73,640. Interest on the contract was payable at 4½ percent per annum, commencing on Mr. Blum's death. According to decedent's lawyer, this was the lowest interest rate that could be used without the imputation by the Internal Revenue Service of interest income on the part of the seller. When pressed, he admitted the interest rate between strangers would have been on the order of six percent. Payments on the contract were to be the *lesser* of $2,000 or "25% of the gross income resulting from the farm less the annual accrued taxes, * * *." No down payment on the part of the Stuarts was required by the contract. The testimony showed that the contracting parties and the attorney (who had represented the decedent and prepared his tax returns for many years) believed the farm was not a good income producer and that, at the time the contract was made, there was little likelihood any payments would have been due on the contract for some time.

Exactly what was conveyed by the contract of sale is unclear. The contract recites that the purchasers agree to purchase certain real and personal property. This is followed by a real property description and a listing of personal property (including farm

equipment and 162 head of livestock). However, later in the agreement, it states that the $70,000 is for real property, and no mention is made of the personal property. The court concludes that the language of the contract and the parol evidence adduced at trial indicate an intent to pass Mr. Blum's interest in the personal property.

The Stuarts testified that the reason the contract included no consideration for the farm's personal property was because at least half of it was theirs by virtue of the partnership agreement entered into in 1963. However, the partnership agreement did not give them any interest in the farm personalty other than that personalty they owned by virtue of their share of undistributed farm profits. It appears to the court that the parties, including their attorney, feared that the partnership agreement had no efficacy and wished to insure that the title to personalty was legally transferred. The result is that the value of the considerable amount of personal property transferred by the contract was not included in the $70,000 figure.

After the contract had been signed, Mr. Blum did not move out of his house on the farm, although all possessory rights had passed to the Stuarts. The Stuarts did pay the taxes and the insurance on the farm, as typically required of purchasers. They also paid the expenses of Mr. Blum's home except for lights and telephone. Mr. Stuart did assume primary responsibility for operating the farm. Mr. Blum's involvement diminished; the testimony was that he only did the things he enjoyed (*e.g.,* feeding the cows once a week). The testimony is quite clear that Mr. Blum was a healthy, vigorous individual during the period before and after the sale.

During the six years Mr. Blum survived, the Stuarts never made any payments to him on the con-

tract. The testimony at trial indicated that they believed they owed him money but considered themselves unable to pay. However, their 1967 to 1972 tax returns indicate that under the contractual "25 percent less property taxes" formula for payment, no payments were due.

The returns also showed that between 1967 and 1972, approximately $46,000 of timber was sold off the farm by the Stuarts. The proceeds were reinvested in farm equipment. (The sale of timber constitutes a return of capital and would not trigger payments under the contract's provisions.) The timber's basis on the Stuart's income tax returns is curiously varied. (The returns were prepared under the supervision and control of the lawyer who drafted the will and the contract.) For the sales occurring prior to Mr. Blum's death, a very low or nominal basis was listed. In contradiction, a $22,000 sale of timber consummated less than six months after Mr. Blum's death was given a basis of $20,000, with the date of acquisition listed as "6/72." All of the basis, of course, should have been an allocation of the $70,000 purchase price (subject to amendment to the basis found to be correct).

The Department of Revenue contends that the facts show that the property should be included within the decedent's estate for purposes of Oregon's inheritance tax laws. Reliance is placed on ORS 118.010(1) which subjects to inheritance tax all transfers

"* * * made in contemplation of the death of the grantor or bargainor or intended to take effect in possession or enjoyment after the death of the grantor, bargainor or donor * * *."

The department's precise theory for imposing the inheritance tax in this suit has not been clear. There appears to be a failure to heed the difference

between the two statutory theories for inclusion within the estate of such a transfer. The opinion and order, the pleadings and briefs, and the department's witnesses confused the concept of a gift made in contemplation of death with that of a transfer intended to take effect at death. Although both theories are used to require inclusion within a decedent's estate of inter vivos transfers made for less than full and adequate consideration, they are based on different criteria.

Under Oregon law, a gift made in contemplation of the death of the decedent is included in his estate. There is a presumption of contemplation of death for gifts made within three years of the death of the decedent. In addition, a gift in contemplation of death made more than three years prior to the death of the decedent may only be included in the estate if there was some liability for unpaid gift taxes. ORS 118.010(3); *Hardwick v. Dept. of Revenue,* 272 Or 100, 535 P2d 89, 93 (1975). In such an instance, the burden of proof that the donor contemplated death is placed on the defendant. It has been admitted that no gift taxes were paid on the 1966 transfer of the farm, but it has not been conceded by plaintiff that any gift taxes were due.

On the other hand, a transfer intended to take effect at death is a separate concept. It requires an inter vivos transfer but it only includes transfers that delay the shift of economic interests in the property until after the death of the decedent. There is no three-year rule or gift tax rule related to the taxability of a transfer intended to take effect at death. Under Oregon's statute, whether gift tax was paid is irrelevant; all that need be shown is that the transfer to the decedent's beneficiaries took effect at death.

The theory chiefly relied on by defendant to in-

clude the value of the farm in the estate was that it was a transfer intended to take effect at death. To sustain this contention, the defendant must show that the transfer was not made for full consideration in money or money's worth, and that, despite the 1966 contractual provisions, no actual transfer took place until the death of the decedent.

 The first question is the adequacy of the consideration. For contractual purposes, the 1966 contract would be a binding contract because it is based on some consideration. However, for inheritance tax purposes, all that need be shown is that this was not "a bona fide sale for an adequate and full consideration in money or money's worth." Stephens, Maxfield & Lind, *Federal Estate and Gift Taxation* 4-62 (3d ed 1974). This is true in the instant case. There was no down payment made on the contract. At a minimum, the decedent would have had to live 35 years (to age 113) if he were to receive the full $2,000 per year on the contract, and events showed that he had received nothing before his death. Interest was foregone on the contract until the decedent died and a very low interest rate was to be used thereafter. Standard mortality tables show the decedent had a life expectancy at age 78 of around eight years.[2] At $4\frac{1}{2}$ percent, $29,547 worth of interest was foregone by the decedent. At 6 percent, the going rate of interest between individuals dealing at arm's length, the foregone interest would have totalled $41,566. Finally, the contract did not include consideration for the personal property on the farm. On its face, the contract was not made for full and adequate consideration.

 However, the defendant goes further. It contends that the value of the property on June 1,

[2] U.S. Dep't of Health, Education, and Welfare, Public Health Service, II *Vital Statistics of the United States 1969,* pt A, 5-3 (1974).

1966, not including personalty, was $196,000, which is in excess of the $70,000 contractual consideration appearing on the face of the contract. To establish this value, the defendant directed Mr. Richard R. Scheibner, an expert appraiser employed by it, to conduct an appraisal of the property as of June 1, 1966. He appraised the property and submitted a detailed, written report, relying on market data, certifying the value at $196,000. The only evidence adduced by the plaintiff to show a value of $70,000 was the testimony of decedent's lawyer regarding the value the assessor placed on the property. Ordinarily, courts and lawyers must regard assessed valuation as having little or no weight outside of ad valorem tax valuation proceedings. *Highway Commission v. Anderegg,* 241 Or 31, 403 P2d 717 (1965). No detailed discussion of the Scheibner appraisal need be made herein. Whatever weaknesses it may have, it must be given more weight than the testimony of value the assessor had placed on the property. Based on the preponderance of the evidence, the court determines that the consideration anticipated by Mr. Blum could not be the valuable and adequate consideration in money or money's worth contemplated by ORS chapter 118.

■ Although the defendant has shown that this was a transfer made for less than full consideration, it must still show that this was a transfer intended to take effect at death. In determining this, it must be observed that all tax laws, including inheritance tax laws, look to the substance rather than the form of the transaction. *Gregory v. Helvering,* 293 US 465, 55 S Ct 266, 79 L Ed 596, 35-1 USTC ¶ 9043, 14 AFTR 1191, 97 ALR 1355 (1935). This is true, even if the intention of the parties is not evidenced in writing. *People v. Porter,* 287 Ill 401, 123 NE 59, 7 ALR 1041 (1919).

■ What then is the evidence of a transfer tak-

ing effect at death? It is noted that the decedent continued to live on the property, in his home, after the June 1, 1966, transfer. However, possession of the remainder of the 853.73 acres in the farm appears to have been transferred. The Stuarts paid the real property taxes and all the expenses of running the farm. They reported farm income and expenses on their tax returns, as well as the income from the sale of timber on the property. The Stuarts took over primary responsibility for working the farm and Mr. Blum's involvement became only incidental. Evidence that less than full consideration was paid (postponing interest until death, failure to make payments on the contract, etc.), does not tend to show that the transfer was intended to take place at death. The court adopts the thinking of the court in *Kelly v. Woolsey,* 177 Cal 325, 170 P 837, 841 (1918):

> "\* \* \* But the mere fact that the transferor remains in possession and enjoyment, by sufferance, or permission, or at the request of the transferee, does not of necessity establish such intent or agreement [to have a transfer intended to take effect at death], where there are circumstances justifying a reasonable inference that there was no such intent."

The court therefore finds that this was not a transfer intended to take effect at death.

The second ground for including an inter vivos transfer in a decedent's taxable estate for inheritance tax purposes is that it was a gift made in contemplation of death. To sustain this contention, defendant must show that the transfer was not made for full consideration in money or money's worth, that gift taxes were due at the time of transfer and were not reported or paid, and that the transfer was indeed made in contemplation of the transferor's death.

Each element must be separately scrutinized. The

court has previously determined that this was a transfer made for less than full and adequate consideration. Since it has been more than three years between the transfer and the date of death, ORS 118.010(3) requires that the transfer must have resulted in unpaid gift tax liability. The court determines that there was such liability.[3] The final element that is considered in the following paragraphs is whether the decedent made the transfer of his property to the Stuarts in contemplation of his death.

In interpreting IRC (1954), § 2035, the contemplation-of-death statute under federal law, the principal guide to the meaning of the phrase was provided by the Supreme Court in *United States v. Wells,* 283 US 102, 51 S Ct 446, 75 L Ed 867, 2 USTC ¶ 715, 9 AFTR 1440 (1931). The court noted that the contemplation-of-death phrase is not so broad as to apply to transfers made with the general expectation of death entertained by all, yet not so narrow as to apply to gifts *causa mortis.* These thoughts are reflected in the published rules under the Oregon statute, OAR 150-118.010(3):

> "The term 'contemplation of death' does not mean general expectation of eventual death. On the other hand, its meaning is not restricted to an apprehension that death is imminent or near. A transfer in contemplation of death is a disposition of property prompted by the thought of death although other motives are also present. A transfer is prompted by the thought of death if (1)

[3] Oregon's gift tax statute is found at ORS 119.005 et seq. It allows a $15,000 specific exemption plus an annual exclusion of $5,000 for a lineal descendant and $3,000 for a gift to a son-in-law. The court finds that, even assuming that the decedent had not used up any of his exemption or exclusions, the difference between the value of the land and the consideration paid is not less than $23,000. Thus a gift tax would have been due. The plaintiff has admitted that no gift taxes were ever paid.

made with the purpose of avoiding death taxes, (2) made as a substitute for a testamentary disposition of the property, or (3) made for any other motive associated with death. *A transfer may be prompted by the thought of death if made at the time of execution of the will.* The bodily and mental condition of the decedent and all other attendant facts and circumstances are to be scrutinized in order to determine whether or not such thought prompted the disposition. \* \* \*" (Emphasis added.)

To determine the subjective motive of a decedent in transferring property, it is often necessary to consider a conglomeration of objective facts. The following example is gleaned from *Estate of Oliver Johnson,* 10 TC 680, 688 (1948):

"Among the circumstances to be considered and weighed in determining what was the dominant motive of the decedent in making *inter vivos* transfers of his property, are the following: (a) The age of the decedent at the time the transfers were made; (b) the decedent's health, as he knew it, at or before the time of the transfers; (c) the interval between the transfers and the decedent's death; (d) the amount of the property transferred in proportion to the amount of property retained; (e) the nature and disposition of the decedent, e.g., whether cheerful or gloomy, sanguine or morbid, optimistic or pessimistic; (f) the existence of a general testamentary scheme of which the transfers were a part; (g) the relationship of the donee or donees to the decedent, i.e., whether they were the natural objects of his bounty; (h) the existence of a long established gift-making policy on the part of decedent; (i) the existence of a desire on the part of the decedent to escape the burden of managing property by transferring the property to others; (j) the existence of a desire on the part of the decedent to vicariously enjoy the enjoyment by the donees of the property transferred; and (k) the existence of the desire by the decedent of avoid-

ing estate taxes by means of making *inter vivos* transfers of property. * * *"

Going generally through the factors mentioned in the *Estate of Oliver Johnson, supra,* the court concludes that this was, indeed, a gift in contemplation of death. At the time of the transfer, the decedent was 78, an age where even individuals in excellent health show heightened concern with the eventuality of their death. Decedent's will and the real estate contract were signed on the same day.[4] The decedent had a very close relationship with his daughter and son-in-law, making them the natural objects of his bounty. The decedent's lawyer, drafter of both the contract and the will herein considered, testified that Mr. Blum would not have sold the farm to anyone but the Stuarts. The farm constituted the bulk of his estate at the time the contract was executed; thereupon the chose in action replaced the land as his chief asset. The decedent's will is clear that Mr. Blum wished his estate to to be divided equally between Mrs. Stuart and his other daughter and son. Mr. Blum was indifferent to payments of principal or interest to him by the purchasers during his lifetime, but he must have known and intended that, after his death, equal portions of the estate represented by the contract be given to his other daughter and son, in the form of money, with interest. (Mrs. Stuart testified that, after decedent's death, payments have been made to her co-heirs.)

The plaintiff contends that the evidence indicates

---

[4] *See Moses L. Purvin, et al.,* 6 P-H BTA Mem 37-201, 37-202 (1937), where the court noted the following:

"Obviously, the decedent was contemplating his own death when he made his will, and we do not think it can reasonably be inferred that he was in a different frame of mind when on the same day he made provision in another instrument for the payment of annuities to the natural objects of his bounty, * * *."

such life motives as ridding the decedent of the burden of operating the farm, providing the Stuarts with security and avoiding income taxes. However, the record does not indicate such motives. If they were present, they should have been brought out in the testimony. The weight of the evidence reflecting on intent indicates that the farm was transferred in contemplation of the decedent's death.

A gift made in contemplation of death is valued in the decedent's estate tax return at its value on the day of death, less any consideration paid. The defendant has therefore pleaded a value on the day of death, June 2, 1972, of $475,000. To establish this value, the defendant again presented Richard R. Scheibner, who had appraised the property as of the day of death at $475,000. The plaintiff did not produce any evidence as to value, but did attempt to show the weaknesses in the defendant's appraisal. However, no alternative value to the $475,000 was indicated. Although questions were raised in the court's mind as to the validity of the appraisal, the preponderance of the evidence (largely due to the lack of affirmative evidence as to value being presented by the plaintiff) indicates that the value of the property on the day of death was $475,000.

In summary, the court makes the following findings: The value of the property on June 1, 1966, was in excess of the consideration to be paid for the property. Gift tax should have been, but was not, paid on the transfer. The court further finds that this was not a transfer intended to take effect at death, but was a transfer made in contemplation of death. The value of the farm included in the decedent's Oregon inheritance tax return is its value as of the date of death, which the court finds to be $475,000. Defendant's Order No. IH 75-2, dated January 27, 1975, is affirmed.